**James D. HODGSON, Secretary of Labor, Plaintiff,**

v.

**GREYHOUND LINES, INC., Defendant.**

**No. 69 C 2227.**

United States District Court, N. D. Illinois, E. D.

Feb. 5, 1973.

Herman Grant, Regional Sol., Gilbert Drucker, Alan M. Serwer, Attys., U. S. Dept. of Labor, Chicago, Ill., for plaintiff.

Frederick H. Daugherty, Winston & Strawn, Chicago, Ill., L. Norton Preddy, Greyhound Lines, Inc., Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

The proceedings upon which the following opinion is rendered are based upon a Complaint filed by the Secretary of Labor of the United States Department of Labor, requesting the restraining of alleged violations of Sections 4(a)(1), 4(a)(2) and 4(e) of the Age Discrimination in Employment Act of 1967 and for such further relief as is deemed appropriate, including the restraint of any further refusal by defendant to employ persons denied employment in the past because of their ages.

During the course of trial, I have had the benefit of the testimony of eminent witnesses, the arguments of counsel, written memoranda and a multitude of exhibits. This is a case of great moment and my decision has come only after deep deliberation and study.

The issue, herein, is whether defendant's policy of refusing to consider applications of individuals between the ages of 40 and 65 for initial employment as bus drivers is a bona fide occupational qualification reasonably necessary to

the normal operation of its business. Section 4(f)(1) of the Act states as follows:

"It shall not be unlawful for an employer, employment agency, or labor organization—

(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age;"

The plaintiff alleges that the defendant has failed to meet its burden of proving that its age limitation policy for bus driver position is a bona fide occupational qualification reasonably necessary to the normal operation of its business.

The defendant has admitted that it does not consider applicants for the position of interstate bus drivers persons who are between the age of 40 to 65 years and contends that it is entitled to an exception because of Section (f)(1), *supra*, of the Act.

Defendant contends that if it were required to hire beginning interstate bus operators up to the age of 65 an unacceptable risk to the safety of its passengers and other members of the motoring public would ensue.

The defendant has offered the following arguments for its allegation.

"1. The defendant is required by law and by the nature of its business to exercise the highest degree of care, not only in the operation of its buses but in the hiring of bus drivers.

"2. Although individuals up to the age of 65 may be able to pass the required physical examination and be otherwise qualified, such physical examination is incapable of discovering the physical and sensory changes common to all man., [sic], caused by aging, that make an interstate bus oper-

ator less safe in the normal operation of the defendant's business.

"3. That the normal operation of the defendant's business requires that a beginning interstate bus operator serve from 10 to 20 years on the 'extra board' which service requires the highest degree of physical ability and use of the senses.

"4. That its experience of over 40 years proves that an interstate bus driver is most safe after acquiring 16 years of interstate bus driving experience which experience could not be acquired by newly-employed drivers up to the age of 65 years."

Through the centuries volumes have been written on the subject of aging. It is a process that intrigues not only the scientific and philosophic mind but the less learned one as well. Aging is a phenomenon in which all humanity shares. The volumes that have been written are doubtless merely a fraction of what is yet to be studied. There will be inquiry and research as long as man exists for there will be the fascination with himself that leads to such study. For the moment, however, I must rely for my decision on that which exists in the realm of learning and on what I believe is both justiciable and correct under the existing law.

Defendant's policy of not considering applicants over the age of 35 has been in effect since approximately 1929. This is true regardless of an applicant's prior experience. At least two of defendant's officers, Mr. Forman and Mr. Gocke testified that they did not know why age 35 was originally selected nor why other ages were not selected. However, they and defendant's other witnesses vigorously support the age limitation policy and maintain that since the policy has produced results from a safety standpoint it has never been deemed necessary to change the rule. The National Association of Motor Bus Owners (hereinafter referred to as NAMBO) was granted leave to participate as *amicus curiae* for the defendant. In its trial

brief it stated the issue at bar succinctly:

"It is submitted that the essence of the motor carriage of passengers is safety and that if the employment of drivers over age 35 would undermine that safety, the maximum age standard utilized by defendant is "reasonably necessary" within the meaning of the *bona fide* occupational qualification exception to the Act."

Thus, the battle lines have been drawn. The plaintiff contends that the Age Discrimination in Employment Act of 1967 was enacted for the express purpose of "promoting 'employment of older persons based on their ability rather than age'" and prohibiting "arbitrary age discrimination." Hodgson v. First Federal Savings and Loan Ass'n. of Broward County, Fla., 455 F.2d 818, 820 (5th Cir. 1972). The defendant contends that it has established a "valid justification" for its hiring practices. Hodgson v. First Federal, *supra*, pg. 822.

"In discrimination cases the law with respect to burden of proof is well-settled. The plaintiff is required only to make out a prima facie case of unlawful discrimination at which point the burden shifts to the defendant to justify the existence of any disparities. See e.g., Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Muniz v. Beto, 434 F.2d 697 (CA5, 1970); Weeks v. Southern Bell Telephone and Telegraph Company, 408 F.2d 228 (CA5, 1969); Gates v. Georgia-Pacific Corporation, 326 F.Supp. 397 (D.C.D.Or.1970). Once the plaintiff has made out his prima facie case we look to the defendant for an explanation since he is in a position to know whether he failed to hire a person for reasons which would exonerate him." Hodgson v. First Fed. Sav. & L. Ass'n., *supra*, 455 F.2d pg. 822.

I find that the plaintiff has made a *prima facie* case of refusal by the defendant to hire on the basis of age.

Thus, it is incumbent upon me to carefully examine defendant's position and each of its contentions in order to arrive at a decision as to whether or not the defendant's reasons do indeed 'exonerate' it.

Defendant, Greyhound Lines, Inc., is the nation's largest inter city bus carrier with 105,000 route miles within the continental United States. The defendant employs approximately 9,500 bus drivers all of whom must meet certain requirements that are set by the defendant in accordance with Federal Regulations, State Statutes and the defendant's own policies. The above mentioned requirements relate to an individual's character, age (minimum age is 24, maximum is 35), height, weight, education, health, driver training school and probationary period.

The purpose of the health examination is to detect the presence of any physical or mental defect that would affect the applicant's ability safely to operate a motor vehicle. Included in the instructions from the Department of Transportation and the defendant that the examining physicians receive is the following:

"The examining physician should be aware of the vigorous physical demands and mental and emotional responsibilities placed on the driver of a commercial motor vehicle. In the interest of public safety the examining physician is required to certify that the driver does not have any physical, mental, or organic defect of such a nature as to affect the driver's ability to operate safely a commercial motor vehicle. * * * History of certain defects may be cause for rejection or indicate the need for making certain laboratory tests or a further, and more stringent, examination. * * * (Pltf.ex. 6 pg. 1; pltf.ex. 7)."

■ It is axiomatic that common carriers are held to an extremely high degree of care. Thus, it is the defendant's obligation to exercise the highest degree of care possible in all aspects of

its business including, of course, the hiring of bus drivers.

When successfully completed the aforementioned qualifications and requirements merely constitute an entry into defendant's organization. Greyhound bus drivers must continue to meet standards set by the defendant in accordance with Federal Regulations. Those standards include a low accident rate, safe driving habits, good health, good driver attitude and courtesy to customers (Pltf.ex. 1 req. 27). Each driver's reaction time is checked periodically as is his driving ability under all weather conditions. A physical examination is required by Federal Regulations at two-year intervals up to age 50 and annually thereafter until age 65. (Pltf. ex's. 1 and 2 req. 28).

Thus, it may be seen, a fortiori, that defendant does exercise a high degree of care in the hiring of its bus drivers.

Defendant's next contention is that the required physical examination "is incapable of discovering those physical and sensory changes common to all men" that would cause an interstate bus driver to be less safe while in the operation of defendant's business. This premise is not as easily dealt with as was defendant's first contention. The expert testimony tendered at trial and in exhibits differs greatly and so I feel constrained to review certain portions of that material.

Defendant's witness, Dr. Harold Brandaleone, a physician specializing in internal medicine and a medical consultant to bus and trucking companies, testified that he did not believe a man past 40 should be employed in a new job of driving an inter city bus. (tr. 352). Dr. Brandaleone testified that in general after a certain age, usually about 40, degenerative changes occur in the individual such as arteriosclerotic changes in the blood vessels, the heart, the blood vessels in the brain, the kidneys, the lungs, his lower extremities and his visual capacity or sensory changes including a decrease in his ability to see at night (tr. 351; 318). In response to questions concerning physical examinations Dr. Brandaleone testified as follows:

"Well, physical examination can find many of them but there are many things that cannot be detected by physical examination, or even those that may be detected at a periodic examination that could occur every year or every two years in the interim, and this is the thing that concerns me.

"An individual, as he becomes older, can develop any one of these disabilities or infirmities that would make him an unsafe driver, and unless he had been having a physical examination to have these things detected, they would go undetected." (tr. 340).

Further in the testimony the witness testified that the undetectable effects of aging in persons over age 40 are equally as likely to occur in defendant's present bus drivers over age 40 yet he did not consider them unsafe nor did he recommend that defendant retire its drivers at age 40. (tr. 384; 394).

Plaintiff's witness, Dr. Abraham J. Mirkin, a physician and surgeon and the first president of the American Association of Automotive Medicine, testified that defendant's policy of excluding bus driver applicants solely due to chronological age is not based on medical statistics or medical facts since chronological age is not of itself a measurement of an individual's physiological capabilities nor an impairing factor in the ability to drive safely. (tr. 739–40; 749–52; 759; 760). Dr. Mirkin stated the following in relation to physical examinations.

" * * * I feel that although a physical examination for a driver candidate is an important part of the screening process, it is by no means the only factor nor, in my judgment, the most important factor, in determining whether a driver will be good or will not be good.

"I think a physical examination such as DOT gives or such as the

average good internist gives, will screen out certain coarse and gross physical and pathological states and that is all; it will not of itself determine whether an individual is going to be a good driver.

"But all the other things we have to do, investigate the background of an individual, his relationship to police, his relationship to the motor vehicle administrator's office, his relationship to the welfare department, his relationship to Alcoholics Anonymous, his relationship to his indebtedness and his financial control, all of these factors —" (tr. 760–61).

Professor Ross A. McFarland, Ph.D., a physiological psychologist and specialist in the field of aging was tendered as a witness by the plaintiff. Dr. McFarland testified that chronological age is not a reliable index of a person's physical or psychological condition and cannot be a basis to determine the ability of a person to drive. (tr. 1832; 1834; 1854). He emphasized that chronological age is not an accurate index of a person's physical condition, (tr. 1816; 1819), and stated that many physiological and emotional alterations which result from the aging process are not necessarily a cause for driver limitation or impairment. (tr. 1834).

Dr. McFarland testified as follows:

"* * * I think the Greyhound data would show very little evidence that accidents have occurred because of physical defects. I think their medical screening is good and that they would pick up the physically ill or the markedly physically defective person, that would come out.

"There is very little evidence that medical conditions cause many accidents in public transportation. In fact, there are very few—there is less evidence that heart disease and advanced illness cause automobile accidents. I have had two physician

friends die recently and they have drawn up to the side of the road. They have become aware of their illness and they are not apt to have the sudden and acute heart failure while driving.

"This rarely, if ever, occurs in the bus or truck industry—" (tr. 1836).

Later in the trial in response to cross-examination, Dr. McFarland stated the following:

"* * * I am saying that the physical examinations are poor and do not test functional ability, and I want a man judged on the basis of his functional ability, his capacity to do the work, and whenever you employ a man, you immediately put him through all of the functional tests of driving." (tr. 1914).

In an article [1] Dr. McFarland wrote:

"Research has not yet furnished definitive answers to many questions of minimal physical standards for driving and of medical fitness to drive safely. There is great diversity in the requirements of the various states in this connection and in the prevailing professional opinions and practices. Thus far there have only been a few objective studies to establish cut-off points on an experimental basis, and to provide criteria to aid in advising persons with certain physical conditions or the safety of driving." pg. 78.

On page 75 of the same article the author made the following statement:

"The role of the medical profession in appraising fitness to drive an automobile has been based on clinical judgment and experience, rather than on experimental data involving the application of broader principles.

"* * * The use of clinical judgment may be effective in extreme cases, but limited information has been developed for minimum standards re-

1. Psychological and Behavioral Aspects of Automobile Accidents, Reprinted from Traffic Safety Research Review, Volume 12, Number 3, pages 71–80, September 1968.

lating to physical and mental fitness. Furthermore, until very recently, no empirical findings have been reported which indicate that persons suffering from any disease, with the exception of alcoholism, have higher accident rates than persons free from disease."

Dr. McFarland goes on to write of a series of studies begun in 1963 in California in which accident rates per mile were compared for drivers known to the California Department of Motor Vehicles to have medical defects and drivers known not to have medical defects. The drivers with organic medical conditions fell into three categories; those with epilepsy, diabetes and cardio-vascular diseases. However, I should like to note that a thorough medical examination including the use of an electroencephalograph, an electrocardiogram and other diagnostic tests would immediately make any of these illnesses apparent.

Thus, having read and listened to the various witnesses and drawn upon my own experience and knowledge I find one common thread throughout; there is no agreement as to the reliability or the proper weight that ought to be placed on physical examinations. I find, that a physical examination is no more valid a test of driving ability for a 25 year old than for a 45 year old. Therefore, I cannot utilize defendant's second reason as a criterion for deciding that a man of 25 would, merely by virtue of being 25, be a safer driver than the man of 45. I cannot state with definitive certainty that such physical examinations as are given would be capable or incapable of discovering the physical and sensory changes common to all men nor that those changes are necessarily caused only by the aging process nor that such changes in and of themselves make an interstate bus operator less safe in the normal operation of defendant's business.

The third argument tendered by defendant in defense of its policy concerns itself with the "extra board" system. Within Greyhound's organization there are two general classifications of drivers; those who perform 'regular runs' and those who perform 'extra board'. A regular run is one which is performed regularly and is a scheduled service between two given points. On the other hand, 'extra board' runs vary and are performed on the basis of passenger demand and consist of special operations, towns, charters and extra sections of regular runs if there is a call for more than one bus on a regular run. Extra board drivers do not have scheduled routes and work off of the board on a first in, first out basis. On the average an extra board driver is called to perform about four driving runs in a seven day period. (pltf.ex. 29, pp. 43, 55).

Extra board work and regular runs are assigned on the basis of seniority. A driver may go from a regular run to the extra board and back to a regular run (tr. 1176–77) or if he has the necessary seniority, a driver may select a regular run in the winter months which are not as busy as the summer months and then work the extra board in the summer in order to make more money. (tr. 1417–19; 1433).

Neither regular run drivers nor extra board drivers are permitted to drive more than ten hours and cannot be on duty, including driving, for more than fifteen hours, without at least eight consecutive hours off. (pltf.ex. 29, pp. 33–4; Fed.Reg. pltf.ex. 4, 5A, 5B).

It is defendant's strong contention that the rigors of the extra board are such as to necessitate the imposition of an age limitation. Defendant asserts that persons between the ages of 40 and 65 simply do not have the stamina for the irregular work schedule of the extra board. Five of defendant's drivers appeared as witnesses and each testified that being an extra board driver is demanding and physically exhausting work.

However, after listening to the testimony concerning extra board vis a vis regular run driving, I am not convinced

that the irregular hours and possible adverse driving conditions are any more difficult for those applicants over 40 years of age than for those under 40. I cannot accede to a contention which flatly states that all applicants over 40 are inflexible, unadaptable and untrainable and, in effect, that is what I am called upon to do. The defendant has not tendered the necessary statistical evidence to allow for such a finding. The defendant's policy is not based on personal experience or observations of new applicants age 40 or over.

"Speculation cannot supply the place of proof."

Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458; Moore v. Chesapeake Ry. Co., 340 U.S. 573, 578, 71 S.Ct. 428, 430, 95 L.Ed. 547.

In Weeks v. Southern Bell Telephone and Telegraph Co., 408 F.2d 228, 235 (5th Cir. 1969), plaintiff's application for the position of switchman was refused consideration solely because of her sex. The court held in refusing to accept defendant's contention that the job was too strenuous for women:

"We conclude that the principle of nondiscrimination requires that we hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved."

The question thus arises as to whether or not Greyhound has established a "factual basis" for its belief that applicants between the ages of 40 and 65 would be unable to perform safely the duties of an extra board driver. I find it has not established such a basis. It is true as the plaintiff has asserted that "the defendant is in a position to obtain the pertinent objective data simply by comparing the accident records of its extra board drivers who are over 39 years of age with the accident records of its extra board drivers who are under that age. (pltf.post tr.brief, pg. 34). Nor has the defendant compared the relationship between age and applicant failures at the training stages. (tr. 491). It is also true as plaintiff states that the defendant instead combined its statistics for extra board drivers and regular run drivers. These statistics actually show that its drivers over age 40 have a better safety record than those under 40. (deft.exs. 7, 8). Thus it may be assumed that the better safety record of Greyhound drivers over age 40 applies to those on the extra board as well as to those on the regular runs.

There is no requirement that older drivers may not bid for extra board work (tr. 546) and there are drivers, as in Indianapolis, Indiana who after 20 years on the extra board still do not hold regular runs. (tr. 1283-4). Plaintiff submits and I agree that such practices belie any claim that the extra board work is so 'rigorous' that a 40 year old age limit is necessary.

Defendant's fourth argument for continuation of its policy is that an interstate bus driver is most safe after acquiring 16 years of interstate bus driving experience and such experience could not be acquired by newly-employed drivers between age 40 and 65. Numerous charts tendered by the defendant as evidence purported to show statistics which would support defendant's contention. For instance, during 1968-71 drivers between the ages of 24-40 had the highest number of accidents per driver, whereas drivers 41-60 had about the same low accident experience (the drivers between 56-60 showed a slight increase in accidents over the safest age group of 51-55 but substantially below the age group 24-40). Defendant also purported to show that during the same period drivers with up to 5 years' experience had higher accident rates than those with more than 5 years' experience. Defendant asserted that the safest period for drivers occurs from 11 to 25 years after initial employment and that this safe pe-

riod would be lost if applicants were hired after age 40. (Deft.exs. 7, 8).

Dr. John Eberhardt, a research psychologist with the National Highway Traffic Safety Administration, United States Department of Transportation, stated that he had tested the significance of the points on defendant's exhibits 7 and 8 and had found that the alleged "upswings" for the age group 56–60 and for the group with 26–30 years of experience were not significantly different from chance and were insignificant. (tr. 1754–55).

It is most important to note that exhibits 7 and 8 do not take into consideration the number of miles driven by drivers in each age group. (tr. 624). Defendant has stated that older drivers usually hold regular runs. Defendant's exhibit 5 is a chart showing that the average regular run driver drives more than twice as many miles monthly than does the average extra board driver. Since there is no way to know how many miles were driven per driver in each age and experience group in defendant's exhibits 7 and 8 it is not possible to duly compare accidents per mile driven in relation to the age of the driver. In other words, the question is unanswered as to whether a person over age 40 is less safe than one under 40 per mile driven.

One might even conjecture that it is not the fact of experience so much as the maturity of the individual that allows for the safety record of those with 11–25 years of experience. Defendant has admitted that certain causes of accidents, such as emotional immaturity and lack of stability are found more frequently in those under age 35. (tr. 1187). However, we are not in the realm of conjecture and I find that defendant has not satisfactorily proved that the safety record of those drivers with 16 years of interstate bus driving experience is due to the fact that these individuals were hired before reaching the age of 40.

Nor has defendant impressed me with a cogent reason for its refusal to hire drivers over the age of 40 even though those drivers have had other interstate bus driving experience including driving extra board runs for other companies. Defendant contends that applicants over the age of 40 cannot be "untrained" if they have had prior experience and that

"it has been our experience that it is easier to take someone who has never driven a large vehicle and teach him to drive it than to take someone who has learned to drive a large vehicle some place else and then teach him to drive the way we want and expect him to drive our large vehicle." (tr. 645).

Yet, all five of defendant's driver-witnesses had previous commercial driving experience driving buses or large trucks before being employed by Greyhound. (tr. 1290–1; 1296–1300; 1342; 1385; 1440).

It is, I believe, inconsistent to maintain that those who have driven large vehicles and are under age 40 are able to be "untrained" whereas those over age 40 cannot be "untrained". Defendant has offered no evidence that would satisfactorily prove such a contention.

Unable to find merit in defendant's four arguments for its age limitation policy, I should, at this juncture, like to mention a number of other factors, that I have also borne in mind in reaching my final decision.

During certain peak periods the defendant leases equipment and drivers from other bus companies and during those periods the drivers become part of defendant's operations. Such drivers, however, are not subjected to defendant's screening process and they are permitted to drive regardless of the age at which they were hired. (Pltf.ex. 29, pp. 55–9; tr. 1475). However, if any of these drivers over age 40 were to seek permanent employment with the defendant they would not be considered due to the age limitation policy for hiring.

Defendant, in addition to the above mentioned leasing arrangements, operates regular through service in which its buses travel through territory in which

it has no operational authority. In other words, although Greyhound passengers start and end their trip with a Greyhound driver another driver (not one employed by Greyhound) will drive that part of the journey through the territory in which Greyhound does not have operational authority. Once again, defendant does not screen these drivers nor is it aware of whether or not they were hired prior to age 40. (tr. 1471–5; 1127–8; 1185).

Defendant employs certain seasonal drivers known within the industry as "school teacher drivers" who are generally teachers on vacation and are only employed during defendant's peak seasons. Each year defendant recalls and rehires these drivers as new employees up to age 50. Thus, it may be seen that defendant's age limitation policy is not applied although these drivers must meet all the qualifications required of other drivers.

It should be noted that since 1928 when defendant's policy was formulated, there have been a great many changes within and without the motor bus industry that have had great impact on that industry. There has been a significant improvement in the technology of motor buses. For instances, all buses are diesel powered today and far easier to manipulate than in 1928. The roads of this nation are vastly improved over conditions of forty-five years ago. The safety practices and programs and in-depth training by interstate bus companies are far more sophisticated than in 1928. I have placed great weight upon the fact that defendant's officers admitted that they do not know why age 35 was originally chosen as a cutoff date for hiring new bus drivers; defendant has admitted that the age limitation policy was not based upon any "surveys, inquiries, research studies, statistical studies or any other study to our knowledge." (tr. 564–5).

The following exchange between counsel for plaintiff and Mr. Forman, an officer of defendant, serves to buttress my decision that the defendant's policy is not founded on the "factual basis" for its belief that "all or substantially all (members of the protected class) would be unable to perform safely and efficiently the duties of the job involved" that is required under *Weeks, supra,* 408 F.2d pg. 235.

Q. "Is that right, you have in fact no personal experience in initially employing anyone 40 or over as a Greyhound driver?"

A. "That is correct."

Q. "Then you in fact cannot state, based on your own personal knowledge, that the consideration in employment of otherwise qualified individuals 40 or over for initial employment as a bus driver with Greyhound would adversely affect safety, isn't that right?"

A. "You have to take into consideration the problem of the extra board, the rigors that it demands and what this man's life style will be at that time. Good basic common sense tells us that to begin his career as a Greyhound bus driver over age 40, go through the portion of his apprenticeship, when he has the highest number of accidents, and about the time he is getting to his stride the aging process catches up with him and he is right back into the upswing again without having a flattening out." (tr. 1195–6).

I must disagree. "Good basic common sense" does not suffice as "objective data" to satisfy the "factual basis" of the *Weeks* decision. Nor has defendant had any experience with applicants above age 40 so that it could factually state that such drivers would have the highest number of accidents during their apprenticeship.

Defendant need not hire all applicants; the rigid requirements and qualifications now in effect for those applicants under age 40 will continue to be in effect.

Employers are required to "consider" individuals on the basis of what they can contribute, not on the basis of chronological age (113 Cong.Daily Rec. 34744). If ever there were an opportunity for "individual consideration" surely this is one for through its screening process defendant has ample opportunity to exclude those individuals it finds unsuitable for interstate bus driving.

Safety is the foremost concern involved herein not only for defendant but for plaintiff and this Court as well, but I cannot accept the contention that persons over 40 cannot become safe bus drivers. I believe strongly that functional capacity and not chronological age ought be the most important factor as to whether or not an individual can do a job safely. This determination must be made repeatedly throughout the employee's employment experience. The human variances involved are myriad; there is no way to generalize as to the physical capability and physiological makeup of an individual. Nor is there a way to project how an individual will be affected by the aging process.

I thereby conclude that the data prepared by the defendant and the evidence it has presented has not met the burden of demonstrating that its policy of age limitation is reasonably necessary to the normal and safe operation of its business nor that age is a bona fide occupational qualification within the meaning of the Act. Therefore, it is adjudged, ordered and decreed that judgment for the plaintiff and against the defendant be and the same hereby is entered.

### INJUNCTION

Judgment having been entered for the plaintiff and against the defendant as to all issues raised in the Complaint and the pleadings herein, and in implementation of said judgment, the Court hereby enters its injunctive order against the defendant as follows:

Wherefore cause having been shown, judgment is hereby entered permanently enjoining and restraining defendant, its officers, agents, servants, employees, and those persons in active concert or participation with them from violating the provisions of Sections 4(a)(1), 4(a)(2), and 4(e) of the Age Discrimination in Employment Act of 1967, and restraining any further refusal by defendant to employ persons merely on the basis of chronological age alone.