531 F.2d 224
 12 Fair Empl.Prac.Cas. 1233,
11 Empl. Prac. Dec. P 10,916
W. J. USERY, Secretary of Labor, United States Department of
Labor, Plaintiff-Appellant,
v.
TAMIAMI TRAIL TOURS, INC., Defendant-Appellee.
 No. 72--2373.
 United States Court of Appeals,
Fifth Circuit.
 May 5, 1976.
 
 Richard F. Schubert, Sol. of Labor, Dept. of Labor, Washington, D.C., Beverley R. Worrell, Regional Sol., Daniel M. Williams, Jr., Dept. of Labor, Atlanta, Ga., Carin Ann Clauss, Donald S. Shire, Dept. of Labor, Washington, D.C., for plaintiff-appellant.
 Gregory A. Presnell, Thomas G. Garwood, Jr., Orlando, Fla., for defendant-appellee.
 Robert J. Corber, Washington, D.C., for NAMBO.
 Appeal from the United States District Court for the Southern District of Florida.
 Before BROWN, Chief Judge, WISDOM and AINSWORTH, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 We are asked to review the lower court's determination that appellee's (Tamiami) policy of refusing to consider applications of individuals between the ages of 40 and 65 for initial employment as intercity bus drivers is a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of its business. Typically statutory, the words 'reasonably necessary to the normal operation of its business,' are not normally of the variety that suggest hand-wringing, earth-shaking, heart-rendering decisions of great moment. Words can be deceiving though, and we readily perceive and admit that our task in this controversy is not a simple one. Inextricably involved here, on the one hand, is perpetuation of the stated legislative purpose to promote employment of older persons based on their ability rather than age, undeniably a laudable one, which must be somehow balanced against the unquestionably sincere claims of the nationwide busing industry which, as expressed by some of its most eminent spokesmen, has amassed a safety record unsurpassed by any other transportation industry so that the public interest--here a term directly translatable into the safety of millions of intercity bus passengers per year--demands that the non-hiring of intercity bus drivers over 40 years of age be sanctioned as a necessary exception. After reviewing the record at length we are convinced that the concluions of the District Judge were not clearly erroneous. F.R.Civ.P. 52(a). We affirm.
 
 The Proceedings Below
 
 2
 This action was brought by the Secretary of Labor, United States Department of Labor under the provisions of Section 4[1] of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621, et seq., seeking to permanently enjoin Tamiami Trail Tours, Inc. from allegedly denying employment to individuals within the age group protected by the Act[2] and from withholding payment for unpaid wages allegedly due eight individuals (the complaining witnesses herein) because of discrimination against them. In its answer Tamiami admitted that it refused to consider two of the eight complaining witnesses solely on account of their age.[3] With respect to the other six complaining witnesses the defendant contended that it would not have employed them in any event because of reasons other than age.[4] It asserted, however, that such refusal was done pursuant to the BFOQ exemptions provided in § 4(f)(1) of the Age Discrimination in Employment Act of 1967.[5]
 
 
 3
 Thus, the issues for the liability portion of the trial,[6] as reflected by a pre-trial stipulation entered into by the parties, became (i) whether Tamiami's refusal to hire each of the six complaining witnesses listed in the complaint to which their answer indicated a denial was, in actuality, because of the age of each such person, (ii) respecting the two complaining witnesses to which Tamiami's answer admitted denial of employment based upon age, whether age with respect to the position of bus driver is a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of defendant's business within the meaning of § 4(f)(1) of the Age Discrimination in Employment Act, and (iii) if so, whether Tamiami's violations were such that injunction would be warranted.
 
 
 4
 The trial court found that with respect to complaining witnesses Wons and Poole (see note 3, supra) a prima facie case of age discrimination had been made. This, the Court recognized, served to shift the burden of proof to the defendant to justify its hiring policy. From there the trial judge reasoned that whether Tamiami's reliance on § 4(f)(1) of the Act could be a valid defense depended essentially on questions of Tamiami's safety obligations, safe transportation of passengers being the essence of the motor carrier's operations as this Court held in Diaz v. Pan American World Airways, Inc., 5 Cir., 1971, 442 F.2d 385, cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267. Thus, in the District Court's view, Tamiami could sustain its burden of justifying its application of the general rule (i) by showing that it had a factual basis for believing that otherwise its business operations (safety obligations) would be undermined[7] and (ii) by demonstrating that dealing with each applicant over 40 years of age on an individual basis by considering his particular functional ability to perform safely the duties of a driver notwithstanding his age, would be impractical.[8]
 
 
 5
 In support of its defense, Tamiami produced numerous witnesses who testified that, in their opinion, age was a reasonable and necessary employment qualification for the position of intercity bus driver. Representatives of other bus companies testified that their practice (see note 2, supra) was similar to that of Tamiami and was grounded upon reasons of safety. This testimony set out with painstaking clarity the great lengths to which bus companies go to promote safety. Many of Tamiami's witnesses emphasized its strong contention that the rigors of extra board (the meaning of this term to be discussed in detail infra) are such as to necessitate the imposition of an age limitation. So testifying were bus company executives as well as bus drivers themselves, both junior and senior in terms of past service.
 
 
 6
 Introduced also was conflicting expert testimony regarding the effects of the aging process upon the ability to safely perform the duties of bus driver and upon the reliability of an annual or recurringly scheduled full physical examination used as a screening process to detect those physical and sensory changes common to all persons which result from the aging process.
 
 
 7
 In his findings of fact and conclusions of law, the trial judge characterized the dispute as not being such a case of 'arbitrary' age discrimination as contemplated under the Act. The court concluded that the extraordinarily high degree of care required of bus companies in hiring drivers coupled with the fact that the seniority system imposes roughly a 10-year period on the extra board, justified the industry's utilization of an age limitation as the best available tool for screening out unsuitable driver applicants. The Court concluded from the evidence that functional age, as distinguished from the chronological age, of a driver applicant over 40 cannot be determined with sufficient reliability to meet the special safety obligations of motor carriers of passengers. Finding (i) that the defendant had demonstrated a factual basis for its belief that all or substantially all men over 40 would be unable to perform safely and efficiently the duties of the job of intercity bus driver and (ii) that the weight of the evidence introduced supported the view that recurring physical examinations and other testing methods are unreliable in detecting certain of the mental and psychological changes inherent with aging such that individual consideration of applicants over 40 would be highly impractical, i.e. untrustworthy, the court entered its judgment for Tamiami. The court further found that its ruling upholding the 40 year age limitation with regard to the two complaining witnesses for whom the defendant had admitted age was the sole reason for non-hiring[9] made it unnecessary to reach the issues relative to the three remaining complaining witnesses.[10]
 
 The Act
 
 8
 President Johnson, in his Older American Message of January 23, 1967, recommended the Age Discrimination in Employment Act of 1967, which was transmitted to the Congress by the Secretary of Labor in February of that year. The President's message, in the section on job opportunities, stated--
 
 
 9
 Hundreds of thousands, not yet old, not yet voluntarily retired, find themselves jobless because of arbitrary age discrimination. Despite our present low rate of unemployment, there has been a persistent average of 850,000 people age 45 and over who are unemployed. Today more than 3/4 of the billion dollars in unemployment insurance is paid each year to workers who are 45 and over. They comprise 27% of all the unemployed * * * In economic terms, this is a serious--and senseless--loss to a nation on the move. But the greater loss is the cruel sacrifice in happiness and well-being, which joblessness imposes on these citizens and their families. Opportunity must be opened to the many Americans over 45 who are qualified and willing to work. We must end arbitrary age limit on hiring. (113 Cong.Rec. pp. 34743--34744, Dec. 4, 1967.)
 
 
 10
 Recognizing the seriousness of the problem,[11] Congress enacted the Age Discrimination in Employment Act in 1967 for the express purpose of promoting 'employment of older persons based on their ability rather than age' and prohibiting 'arbitrary age discrimination.' The Act makes it unlawful for employers, employment agencies, and labor organizations to discriminate on the basis of age,[12] against persons between the ages of 40 and 65.[13]
 
 
 11
 Section 4(f)(1) provides the BFOQ statutory defense to actions brought for violation of the Act under certain restrictive circumstances.[14] Pursuant to its usual practice, the Department of Labor promulgated an Interpretative Bulletin indicating the construction of the Act which it believed correct to be used as an aid for employers and employees to comply with its provisions. With regard to BFOQ, this Bulletin states that 'whether occupational qualification will be deemed to be 'bonafide' and 'reasonably necessary to the normal operation of the particular business' will be determined on the basis of all the pertinent facts surrounding each particular situation.' The Bulletin further anticipates 'that this concept of a bonafide occupational qualification will have limited scope and application' and reiterating, states that 'further, as this is an exception it must be construed narrowly, and the burden of proof in establishing that it applies is the responsibility of the employer . . . which relies upon it.' The Bulletin continues on to list as an illustration of a possible bonafide occupational qualification those situations where 'federal statutory and regulatory requirements provide compulsory retirement, without reference to the individual's actual physical condition at the terminal age, when such conditions are clearly imposed for the safety and convenience of the public.' The Bulletin cites as an example the situation where federal aviation agency regulations do not permit airline pilots to engage in carrier operations as pilots after they reach age 60. (29 C.F.R. § 860.102).
 
 
 12
 In the section of the Interpretative Bulletin entitled 'differentiations based on reasonable factors other than age' it is again stated that 'the reasonableness of differentiation will be determined on an individual, case by case basis, not on the basis of any general or class concept, with unusual working conditions given weight according to their individual merit.' The Bulletin states that 'a differentiation based on a physical examination, but not one based on age, may be recognized as reasonable in certain job situations which necessitate stringent physical requirements due to inherent occupational factors such as the safety of the individual employees or of other persons in their charge, or those occupations which by nature are particularly hazardous.' It is then stated that 'a claim for a differentiation will not be permitted on the basis of an employer's assumption that every employee over a certain age in a particular type of job usually becomes physically unable to perform the duties of that job.'
 
 
 13
 That these interpretations by the agency charged with the enforcement of the statute are entitled to considerable weight is well settled. Udall v. Tallman, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616; Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158.
 
 The Industry
 
 14
 Tamiami Trail Tours, Inc. is an intrastate and interstate motor common carrier of passengers and baggage operating under certificates of public convenience and necessity issued by the Interstate Commerce Commission and the Florida Public Service Commission. Founded in 1924 and headquartered in Miami, Florida, Tamiami is the oldest bus company in Florida and today provides bus transportation services for the general public in all of Florida, South and Central Georgia and a portion of Alabama. Tamiami participates as one of the larger members of the national trailways system which is a non-profit association of intercity bus companies operating under the common trade name of 'Trailways'. As a regulated common carrier, Tamiami daily conducts innumerable scheduled runs, sight-seeing tours and other special operations for the pleasure and convenience of the traveling public. The sight-seeing tour and charter feature of Tamiami's operation is designed to satisfy the travel needs of a predesignated group of passengers making a specific journey for some mutual purpose and then returning upon completion to the point of origin. Such operations may vary from short cross-city travel to a three or four week transcontinental charter.
 
 
 15
 With respect to bus drivers, Tamiami follows an industry-wide policy of conducting operations under a seniority system which is embodied in its labor contracts. Under the system there are two general classifications of drivers-- those who perform 'regular runs' and those who perform 'extra board.' Extra board drivers consist of operators who have insufficient seniority to successfully attain a regularly scheduled run.
 
 The Extra Board
 
 16
 The nature of Tamiami's business, and for that matter, that of other major bus companies also, necessitates that they operate with approximately 25 to 30% more drivers than would be required to drive the regularly scheduled runs. Accordingly, bus drivers bid for preferred runs on the basis of seniority. Within Tamiami, the existing seniority system relegates a driver to approximately 7 to 12 years of extra board driving before he has sufficient seniority to bid for and obtain a regular route. In such status, extra board operators are called upon to take up the slack in normal operations and to fill in for regular drivers in the event of vacation, sick leave and the addition of extra buses to regularly scheduled runs where needed. Additionally, these drivers are responsible for Tamiami's charter services which constitute a significant portion of its total operations.
 
 
 17
 The term 'extra board' actually refers to a schedule where the drivers are listed on a first in, first out basis. As a driver completes an assignment and returns to his home terminal, he is then placed at the bottom of the extra board list. As additional assignments (over and above the regularly scheduled runs) are to be made by Tamiami, the extra board man whose name is at the top of the list is designated as the driver. A man on the extra board has no flexibility or freedom of choice concerning his assignments. He must take whatever assignment comes up and complete it, whether it be a two week charter to another state or a one-day sight-seeing tour. With each assignment, the next driver on the extra board moves into the 'first out' slot, and so on down the list.[15]
 
 
 18
 There can be little doubt that, since extra board drivers are on call 24 hours per day, 7 days a week, and must be prepared to go anywhere in the continental United States at any time on short notice, the work is demanding and physically exhausting. Although there is a provision under which a driver must be given two hours notice prior to departure time for short trips, 8 to 24 hours prior notice for longer trips,[16] tight scheduling and unforeseen demands frequently greatly diminish a driver's ability to predict the time of his next assignment. As such, it can hardly be disputed that the unpredictability, coupled with the strains and rigors of extra board driving would almost certainly render an extra board driver's opportunity for a normal home or family life more difficult than that of a driver with a seniority-attained scheduled run.
 
 Governmental Safety Regulation
 
 19
 Motor bus carriers, along with all common carriers, are charged both under considerations of public policy and by the operation of law with exercising an extraordinarily high standard of care for the safety of their passengers. Pursuant to the Interstate Commerce Act[17] as well as other laws,[18] the Bureau of Motor Carriers Safety has issued detailed regulations affecting drivers[19] among other aspects of motor carrier passenger operations (49 C.F.R. Parts 390--396). These regulations prescribe minimum qualifications for the drivers of motor vehicles and minimum standards governing the forms of employment applications, written and road tests to be given, and physical requirements applicable to drivers (49 C.F.R. Part 391). They further impose the rules under which motor vehicles shall be driven (49 C.F.R. Part 392). The hours of service permitted drivers are also set out in detail (49 C.F.R. Part 395) (see note 16, supra). That these regulations are minimum standards only is expressly provided--
 
 
 20
 Nothing in parts 390--397 of this subchapter prohibits a motor carrier from requiring and enforcing more stringent rules and regulations relating to safety of operation (49 C.F.R. Part 392.1(b)).
 
 
 21
 The Department of Transportation has instituted programs for surveillance to insure compliance with these regulations by drivers and carriers. The fifth annual report of the Department of Transportation for fiscal year 1971 contained a section on motor carrier safety which described such activities of the Government.[20]
 
 Tamiami's Practices
 
 22
 Tamiami, certainly not alone in the busing industry, has paid careful heed to the rigorous federal and state regulations governing such operations. Commendably, their operations for selection of drivers are exercised with the utmost care for insuring the safety of the traveling public. The hiring process at Tamiami begins with a written application form designed to eliminate those applicants who are unqualified.[21] Those applicants who are not eliminated initially by the written application, must next be interviewed and approved by Tamiami's personnel officer or his designated delegate. In addition an applicant must receive a favorable report from a retail credit company. All applicants are subject to thorough physical examination by a qualified physician.
 
 
 23
 Once hired, the drivers are given recurring physical examinations on an annual basis (although the Department of Transportation requires physical examinations only once every two years). The physical examination given to all applicants and incumbent drivers is extremely thorough and rigorous. Indicative of the examinations thoroughness is that under vision, the physician must check peripheral vision, distance vision and color vision. The Department of Transportation issues instructions to examining physicians advising them that 'the examination should be made carefully * * $ and provides each with detailed minimal instructions.[22] Further guidance prescribes that 'History of certain defects may * * * indicate the need for making certain laboratory tests or a further, and more stringent, examination.'[22] The Department of Transportation cautions the examining physician to keep in mind 'the rigorous physical demands and mental emotional responsibilities placed on a driver of a commercial motor vehicle,' pointing out that 'in the interest of public safety, the examining physician is required to certify that the driver does not have any physical, mental or organic defects of such a nature as to effect the driver's ability to operate safely a commercial motor vehicle.'[22] Additionally, Tamiami interviews each examining physician to make absolutely certain that he is familiar with the requisite physical standards.
 
 
 24
 Tamiami's training program for new drivers is conducted by their own personnel and lasts approximately six weeks, the bulk of which time is spent in operating the bus under all conditions, including night driving, under the supervision of either an instructor or one of the regular bus drivers who is required to fill out a form evaluating the student's performance. Upon completion of the training course, the student driver is given a comprehensive road test, which requires the examiner to grade the student on 120 different driving skills (parking, steering, stopping, slowing, passing, turning, etc.), using a form prepared by the Department of Transportation. The examiner also grades the student on his alertness and attentiveness, willingness to take instructions and suggestions, degree of nervousness and apprehensiveness, whether the applicant is easily angered, and physical stamina. Tamiami further continuously evaluates its drivers in terms of their job performance, safety record, attitude and physical fitness and, on the basis of these evaluations, may require particular drivers to report for more frequent physical examinations or to undergo periodic retraining.
 
 
 25
 Throughout its history of operation, Tamiami has compiled an enviable record of safe, accident-free driving mileage and has been recognized within the motor bus industry by many highly coveted safety awards.
 
 The Question
 
 26
 With this as background, the question presented is whether the conclusion of the District Judge that age is a bona fide occupational qualification reasonably necessary to the safe operation of Tamiami Trail Tours, Inc. is clearly erroneous. F.R.Civ.P. 52(a); Zenith Radio Corp. v. Hazeltine Research, 1969, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129; Chalk v. Beto, 5 Cir., 1970, 429 F.2d 225. The Government specifically challenges this conclusion on the grounds that (1) the evidence showed conclusory assertions--not the 'factual basis' we required in Weeks to establish the BFOQ, and (2) that there was insufficient evidence to show that it would be highly impractical to evaluate older driver-applicants on an individual basis. Tamiami, the Government contends, should have been made to compare the accident records of its extra board drivers over 40 with the accident rates of its under 40 extra board drivers in order to carry its burden. The Government suggests that the conclusions of the District Judge generally represent precisely the stereotypical thinking that the ADEA was designed to prevent.
 
 The Safety Factor And The Weeks-Diaz Test
 
 27
 We are not the first Circuit to consider this question. In Hodgson v. Greyhound Lines, Inc., 7 Cir., 1974, 499 F.2d 859, cert. denied sub nom., Brennan v. Greyhound Lines, Inc., 1975, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822, the Seventh Circuit reviewed the even more exclusive hiring policy of Greyhound precluding the employment of intercity bus drivers 35 years or older. The District Judge had determined that Greyhound failed to carry its burden to demonstrate a factual basis for its belief that its policy was reasonably necessary for the safe operation of its business.[23] Although the District Judge relied primarily on our Weeks case, the Court of Appeals chose to shift the focus for determining the standards to prove up the defense. In view of the overriding public safety factor not present in Weeks, the Seventh Circuit, relying on Diaz,[24] required Greyhound to demonstrate that the essence of its business would be endangered by hiring drivers who were over 40.[25]
 
 
 28
 The Seventh Circuit in Greyhound concluded that
 
 
 29
 Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice.
 
 
 30
 499 F.2d at 863.
 
 
 31
 In reassessing all of the evidence under this revised standard, the Court concluded that Greyhound by demonstrating the rigors of the extra board and the degenerative effects of age upon the human body, plus the statistical evidence showing that the profile of the safest Greyhound driver shows him to be approximately 50 to 56 years of age with 16 to 20 years experience (which he could not acquire if hired after 40) adequately demonstrated that Greyhound's position that elimination of its maximum hiring age would increase the potential risk of harm to its passengers was grounded on an adequate factual basis. The Court therefore held the findings to the contrary to be clearly erroneous.
 
 
 32
 The Greyhound court distinguished Weeks on the ground that 'the Fifth Circuit was not confronted with a situation where the lives of numerous persons are completely dependent on the capabilities of the job applicant.' 499 F.2d at 861--62. The question raised, therefore, is whether the Weeks requisite of the BFOQ test should be dropped or modified when the safety factor is present. Though we agree with the Greyhound court that the safety of third parties is a factor which cannot be ignored, we believe that this safety factor is already appropriately highlighted within the current framework of the Weeks-Diaz test.
 
 
 33
 In Weeks we held that the employer's refusal to hire women for a job that required occasional strenuous activity violated the Title VII prohibition of employment discrimination. In rejecting the employer's assertion of the BFOQ defense, we set out the test for qualification for that defense:
 
 
 34
 an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.
 
 
 35
 408 F.2d at 235. However, even when the employer cannot carry this burden, if it demonstrates 'that it is impossible or highly impractical to deal with women on an individualized basis, it may apply a reasonable general rule.' 408 F.2d at 235 n. 5. (See note 8, supra.) One method by which the employer can carry this burden is to establish that some members of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class.[26]
 
 
 36
 The second element of the employer's burden under the BFOQ defense was set out in Diaz, in which we invalidated the employer's policy of refusing to hire males for jobs as airline cabin attendants. The statutory requirement that the BFOQ be 'reasonably necessary' to the operation of the business was construed to limit qualification for the defense to those cases in which 'the essence of the business operation would be undermined by not hiring members of one sex exclusively.' 442 F.2d at 388. We then noted that '(t)he primary function of an airline is to transport passengers safely from one point to another.' Id. See note 29, infra. We held that the employer could not carry its burden under the BFOQ defense because, although most males may not be able to adequately perform the nonmechanical functions of a cabin attendant, this would not undermine the safe transportation of passengers.[27]
 
 
 37
 It is in the Diaz element of the BFOQ defense that the third-party safety factor comes into play. Diaz mandates that the job qualifications which the employer invokes to justify his discrimination must be reasonably necessary to the essence of his business--here, the safe transportation of bus passengers from one point to another. The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving. Thus, it is the Diaz element rather than the Weeks element of the BFOQ defense which adjusts to the safety factor.
 
 
 38
 It is important to understand that once an employer's job qualifications have passed muster under Diaz, the Weeks element of the BFOQ test does not mandate hiring applicants who do not meet these perhaps stringent qualifications. On the contrary, if all or substantially all members of a class do not qualify, or if there is no practical way reliably to differentiate the qualified from the unqualified applicants in that class, it is precisely then that Weeks permits otherwise proscribed class discrimination as a BFOQ. The Weeks test does not mandate either the hiring of unqualified applicants or applicants whose qualifications cannot be reliably determined, whether or not they are black or female or over 40 years old.[28]
 
 
 39
 No one has suggested that Tamiami's stringent job qualifications (discussed above at p. 233) for the position of bus driver are either unrelated[29] to the essence of the business or unreasonable[30] in light of the safety risk. Tamiami has unquestionably satisfied the Diaz prong of the BFOQ test.
 
 
 40
 Having overcome this threshold obstacle which tripped Pan Am in Diaz, Tamiami faces the second, double-faceted prong of the BFOQ test set out in Weeks: whether it had reasonable cause, that is, a factual basis, for believing that all or substantially all persons over 40 would be unable to perform safely and efficiently the duties of the job involved, or whether it is impossible or impractical to deal with persons over 40 on an individualized basis. See note 8, supra.
 
 
 41
 Tamiami did not attempt to establish a factual basis for believing that substantially all job applicants over 40 years of age would be unable to drive buses safely. It is thus relegated to the 'footnote 5' burden in Weeks of demonstrating that the passenger-endangering characteristics of over-40-year-old job applicants cannot practically be ascertained by some hiring test other than automatic exclusion on the basis of age.
 
 Trial Court's Findings Supported
 
 42
 Much of the evidence submitted by Tamiami on the BFOQ issue, and relied upon by the District Court, is either irrelevant to the Weeks (footnote 5) standard or insufficient to carry Tamiami's burden.
 
 
 43
 (1) For about his first ten years of employment, the bus driver works on the 'extra board,' which often requires driving long routes in the early morning hours with little advance notice. Tamiami contends that older drivers should not be subjected to such pressures. Women now have the same right '(m)en have always had . . . to determine whether the incremental increase in remuneration for strenuous, dangerous, obnoxious, boring or unromantic tasks is worth the candle.' Weeks, 408 F.2d at 236. Similarly, over-forty-year-old workers should have the same opportunity as do their younger counterparts to take on the pressures of extra board driving, assuming that this does not increase the risk to passengers. The above argument therefore cannot satisfy Tamiami's BFOQ burden under the footnote 5 alternative of Weeks unless it establishes that there is no hiring test that would distinguish between those older drivers who can drive safely despite the pressures and those who cannot.
 
 
 44
 (2) Because of the established seniority system, Tamiami argues that older bus drivers can compensate for the decline in physical attributes that is part of the aging process by choosing day shifts and short routes. If older applicants were hired, however, they could not chose the easier shifts because they would not have seniority. One flaw in this argument is that the seniority system is not necessarily beyond challenge under the ADEA. Moreover, the fact that taking on the lighter load is voluntary must reflect Tamiami's view that safety factors do not mandate that older drivers not be allowed to work the extra board.
 
 
 45
 (3) Tamiami presented statistical evidence indicating that there is a correlation between age and accident frequency. This is an insufficient showing because an examination may reveal whether a job applicant possesses any of the passenger-endangering physical liabilities that many older people have. In other words, the correlation is to physical deficiencies, not to age per se.
 
 
 46
 Tamiami, however, did present proof that, if accepted, would satisfy its BFOQ burden under Weeks (footnote 5). Tamiami introduced testimony by both medical and transportation experts. In particular the testimony of Dr. Harold Brandaleone, an eminent medical expert in the field of transportation and motor vehicle accidents, was heavily weighted by the Court. Dr. Brandaleone testified that while chronological age could not be isolated as a factor automatically indicating that an individual could not adjust to the rigors of the extra board schedule, medical science could not accurately separate chronological from functional or physiological age. According to him, (1) certain physiological and psychological changes that accompany the aging process decrease the person's ability to drive safely and (2) even the most refined examinations cannot detect all of these changes. In his opinion 40 years of age was by no means an arbitrary cutoff to enable bus companies to screen out such impairments.[31]
 
 
 47
 In addition to this medical testimony, Tamiami called Dr. Ernest G. Cox, former Safety Director for the Bureau of Motor Carriers in the Interstate Commerce Commission and later Deputy Director of the Bureau of Motor Carrier Safety in the Department of Transportation to explain the strains on intercity drivers and the importance of the driver's relationship to traffic safety. Dr. Cox expressed the unequivocal opinion that the maximum age qualification was essential to the normal and safe operation of intercity bus lines.
 
 
 48
 Lastly, Tamiami called five of its current drivers--both senior and extra board juniors--to describe their experiences with the driving conditions of the extra board and regular runs. It was clear from their testimony that acquiring enough seniority to get off the extra board was a primary goal of every driver. Despite their experience, the regular run senior drivers emphatically believed that they could not return to the extra board and still maintain the safety of their passengers.
 
 
 49
 In contrast to Dr. Brandaleone's medical testimony, the Government relied primarily on the rebuttal testimony of Dr. Abraham J. Mirkin, an expert on automotive accidents, who dismissed any relationship between age and one's ability to drive a vehicle safely, and Kenneth Pierson, Dr. Cox' successor as Deputy Director of the Bureau of Motor Carrier Safety of DOT, who believed that the physical examination, training program and road test that all new drivers are subjected to were sufficient to screen out those applicants of any age who would not be qualified to be safe bus drivers.
 
 
 50
 The key question is whether a sufficient factual basis for Tamiami's case has been demonstrated by the catalogued strains and pressures of the extra board on the drivers who must serve it, the evidence regarding the inevitable physiological degeneration that accompanies age, and in particular the testimony of Dr. Brandaleone--which the District Judge was entitled to credit fully--that the available tests cannot distinguish those drivers not yet affected by the more crucial age-related accident-causing impairments like loss of stamina, etc. Whatever might have been our finding were we deciding this issue de novo, the District Court found that examinations cannot detect the relevant physiological and psychological changes 'with sufficient reliability to meet the special safety obligations of motor carriers of passengers.' Hodgson v. Tamiami Trial Tours, Inc., S.D.Fla., 1972, 4 E.P.D. P7795, at 6051. This is a finding of fact and, therefore, may not be set aside unless 'clearly erroneous.' Fed.R.Civ.P. 52(a). Because of the testimony of Dr. Brandaleone, we do not believe the District Court's finding can be so categorized.[32]
 
 Refrain
 
 51
 This interpretation of Weeks-Diaz clarifies the significance of safety to passengers and members of the public. We emphasize safety in busing just as we would in a variety of other industrial areas where safety to fellow employees is of such humane importance that the employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb. The employer must of course show a reasonable basis for its assessment of risk of injury/death. Bit is cannot be expected to establish this to a certainty, for certainty would require running the risk until a tragic accident would prove that the judgment was sound. Priceless as is a single life in our concept of the value of human life and our undoubted unwillingness ever to approve a practice which might kill one but not, say, twenty, we think the safety factor should be evaluated in terms of the possibility or likelihood of injury/death.
 
 
 52
 The ADEA was designed to eliminate unjustifiable age barriers to the competitive job market erected by societal conventions. To fell these barriers, Congress used the tried-and-true tool of a strong presumption against maximum age hiring categories. Against this presumption, however, the employer may vindicate his hiring policies by demonstrating that the contended discrimination is a bona fide occupational qualification that meets the Weeks-Diaz standard discussed in this opinion.
 
 
 53
 AFFIRMED.
 
 
 54
 JOHN R. BROWN, Chef Judge (concurring specially):[33]
 
 
 55
 While, as author for the Court, I join fully in the Court's opinion affirming the District Judge and would not detract from it as long as the Court is committed to the proposition that we must decide it here and now, I believe that the ideal resolution here is not an outright affirmance but that the Court seek further infromation and guidance by requiring DOT, the agency specially vested with the resources to investigate, hear and then decide initially such difficult transportation questions to make its official position known under its primary jurisdiction. I am not concerned that the District Judge based his findings of fact on insufficient evidence but that the Courts have input from all of the best available sources before they decide crucial questions such as this.
 
 Primary Jurisdiction Of DOT--The Next Step
 
 56
 Although the structure of the Age Discrimination in Employment Act[34] like that of the Equal Employment Opportunity Act,[35] the Equal Pay Act[36] and the Fair Labor Standards Act[37] is one calling for enforcement through court action, not by an administrative agency as in the case of the Labor Management Relations Act[38] and others, the ultimate obligation of the courtimposed determination does not necessarily compel that the court-judicial responsibilities be fulfilled in any particular way. Indeed, the Court, faced with one of these discrimination cases has the full arsenal of a United States District Court, and it may--and often times should--exploit them as the circumstances require.
 
 
 57
 One of the most effective weapons in the judicial arsenal, although reserved for specialized use as an atomic war-head, is the doctrine of primary jurisdiction. By invoking it we would not be initially faced with the narrow but awesome appellate function of determining whether the trial court proceeded on the right basis below or whether on accepted legal principles the Court had ample basis for its factual conclusions. Undertaking to do so at this stage, I am troubled by the ominous nature of both the problem and any solution. For all practical purposes, in the single hand of a United States District Judge--or in the hands of an anonymous 12 or 6 for those discrimination cases tried before a jury, see Curtis v. Loether, 1974, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260--is the determination of what the law enacted by Congress may require with respect to the employment practices in a nationwide industry. Of course, there is always the possibility that the jury determination will not meet the Boeing[39] substantial evidence test and for the larger number of cases tried to the Court there is the possibility of the finding being held clearly erroneous despite the buckler and shield of F.R.Civ.P. 52(a).
 
 
 58
 But these occasions will be rare and this record illustrates the problem to perfection. A hard fought case with highly competent counsel on each side putting forward and testing and counter-testing proof and counter-proof, the decision finally comes down to a single man. Of course, no one was more conscious of this ominous responsibility than the distinguished trial judge. On him--and more directly on his decision--rests the safety of the public. If he were to hold with the Government that the 40-year age requirement is too low and allow, say, a 45, a 50, or even a 55-year limitation, the consequences of that decision would be portentous if, after a major accident, it were determined on competent investigation that the occurrence was due to driver-error resulting from a non-detectable physical defect directly associated with the aging process.[40] On the other hand to keep out hundreds, and more probably thousands, of otherwise physically qualified persons whose only limitation is that of an age somewhere between 40 and 65 because of the possibility of such an occurrence, is a serious tragedy of national proportions particularly in the light of the congressional determination that this vast and ever-growing body of citizens suffers unwarranted discrimination at a time when they are least able to combat it.
 
 
 59
 Of course, Federal Judges--and particularly Federal District Judges--have to make these hard and difficult decisions day-by-day. And, under the structure[41] of this Act, the ultimate burden is on the Court to make that very decision. But the fact that the Judge must finally make the critical decision which, barring the unlikely event of reversal on appeal, will be binding on the 33 million people of the Fifth Circuit, if not the Nation[42] through the operation of stare decisis, makes it important that the Court should take the fullest advantage of presently available reliable sources of guidance. That help is readily available through an agency having statutory responsibilities for driver-related safety in the operation of interstate buses. That help is available through primary jurisdiction of the Department of Transportation.
 
 
 60
 The first thing to bear in mind is that the doctrine of primary jurisdiction is one of the law's recognized techniques. It is in no sense an abdication. Following in the footsteps of the Supreme Court, we have many many times resorted to it.
 
 
 61
 The Supreme Court makes this clear and the distinction between ordinary 'exhaustion' and 'primary jurisdiction' in United States v. Western Pacific R.R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.
 
 
 62
 The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433, (60 S.Ct. 325, 331), 84 L.Ed. 361.
 
 
 63
 352 U.S. at 63--64, 77 S.Ct. at 165, 1 L.Ed.2d at 132.
 
 
 64
 Of course nice judgment is used to determine when to invoke primary jurisdiction lest the Court run from every difficult decision on the comfortable assurance that someone else can take a stab at it first. In each case, it is a question of whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided. The Court pointed out that in earlier cases the emphasis was on the desirability of uniformity. 'More recently' the Court went on, 'the expert and specialized knowledge of the agencies involved has been particularly stressed. See Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.' 352 U.S. at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132.
 
 
 65
 What bears continual emphasis is that the Court neither passes off final decision on to another tribunal nor escapes from its ultimate duty to decide. For after the exercise of primary jurisdiction determination by the agency concerned, the case comes back in a suitable way for the Court, as a Court, to act. Thus, the Court relying on Far East Conference, went on:
 
 
 66
 The two factors are part of the same principle,
 
 
 67
 'now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.' Id., (342 U.S.) at pages 574--575, (72 S.Ct. at page 494).
 
 
 68
 352 U.S. at 64--65, 77 S.Ct. at 165, 1 L.Ed.2d at 132.
 
 
 69
 This Court with the blessing of the Supreme Court has invoked the doctrine of primary jurisdiction in a variety of situations. Thus in River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, 1958 A.M.C. 1534 (after remand, 5 Cir., 1960, 274 F.2d 36, 1960 A.M.C. 2064), this Court vacated a judgment of the District Court and remanded the case to the District Court with instructions to require the parties to seek a declaratory decision from the ICC on the validity of an exculpatory tariff on the responsibility of a common carrier by water toward cargo on barges in a common carrier tow. Although this posed a definitive question of law, i.e., the legal validity of a tariff, and brought into serious question the continued vitality of the Supreme Court's then recent opinion in Bisso,[43] the Court after exploring all the various operative circumstances which might reasonably be significant pro and con in the determination of the validity of the tariff declared in positive terms 'that the Court of Appeals correctly ruled that the exculpatory clause here at issue should not be struck down as a matter of law, and that the parties should be afforded a reasonable opportunity to obtain from the I.C.C., in an appropriate form of proceeding, a determination as to the particular circumstances of the tugboat industry which lend justification to this form of clause, if any there be * * *.'[44] Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 421, 79 S.Ct. 1210, 1217, 3 L.Ed.2d 1334, 1343, 1959 A.M.C. 1631.
 
 
 70
 Indeed, the question of law referred to the primary jurisdiction agency can be one involving the very jurisdiction of the agency to act. Thus in Weymouth and Huber[45] this Court held that the question of whether gas royalty payments to lessors by lessee producing companies were subject to jurisdiction of the FPC under the Natural Gas Act was a matter which should be referred in the first instance to the FPC.[46]
 
 
 71
 We thought, perhaps mistakenly, that we were charting a new course.[47] Time, tide, and history prove that we were right. For six years later, again in a case involving the FPC and the Natural Gas Act, but this time reversing us, the Court expressly held in United Gas Pipe Line Co. v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 647--48, 92 S.Ct. 1827, 32 L.Ed.2d 369 that the administrative agency is to determine its own jurisdiction initially.
 
 
 72
 Likewise, in Agricultural Transportation Association of Texas v. King, 5 Cir., 1965, 349 F.2d 873, after analyzing the intricate interplay of a number of federal statutes including the Transportation Act, those pertaining to agricultural co-ops and Florida laws on carriers, we determined that the question of law, or the possible mixed question of law and fact of whether the carrier was exempt as an agricultural co-op should be referred to the ICC.[48]
 
 
 73
 In Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486, 497 we referred to the FCC the question of validity of the telephone company's Tariff 132 on the connection of foreign equipment. As analyzed by us, the validity of this tariff was at the heart of the private antitrust action brought by manufacturers of foreign equipment, the use of which by customers of the telephone company was forbidden by Tariff 132. We reasoned that if the tariff were valid the company could rightfully exclude the connection of foreign equipment. If not valid, then issues were open under the antitrust laws. We not only invoked primary jurisdiction again, but sustained the District Court for having done so on its own on the grounds that if we could order it so could a District Court and often times it should.[49]
 
 
 74
 The common ingredient in the primary jurisdiction reference cases is that there must be an agency statutorily invested with responsibility for the determination and effectuation of policy within the given field which will be affected or influenced by, or influence, the issue posed for Court determination. This is of dual significance. First, it eliminates any specter of a wholesale retreat by District Courts or this Court from employment discrimination cases. Only in limited areas will there be an agency such as DOT. Second--likewise a limiting factor--the responsibilities of DOT are directly related to driver-safety operations. By long-standing regulations (see notes 16, 17 and 18, supra). DOT has prescribed stringent and explicit regulations concerning hours of work, physical qualifications and physical examinations. It is in the safety business in a very big way, conducting some 64,000 inspections related to safety annually (see note 20, supra).
 
 
 75
 Likewise, in the determination of a factor as decisive as the age of employment having such universal application an administrative agency with its broader power of inquiry should be in a better position to evaluate the various factors pro and con than a Court on the limited record--no matter how long the trial--that traditional adversary rules of evidence bring about.[50] No matter how finally characterized, the decision of a Court (sustained on appeal) that a given age for employment of interstate bus drivers is or is not acceptable is a legislative judgment in its operative effect in the sense that while court-determined on a record presented by the immediate parties, it has an industry-wide effect. And it is the capacity of an administrative agency to marshal the abundant material from all aspects of a given industrial activity that gives to this important governmental machinery its acceptable expertise.
 
 
 76
 Although the analkogy is not perfect--analogies seldom, if ever, are--some light is shed on our way through (or out) by the contrasting concepts of 'adjudicative' facts or 'legislative' facts.
 
 
 77
 As a member of a heavily regulated industry, Tamiami's operations with respect to measures concerned with maintenance of safety in interstate commerce are primarily, if not solely, under the aegis of the Department of Transportation (see note 18, supra). Thus the semi-ligislative responsibility regarding qualifications and maximum hours of service of employees, and safety of operation and equipment are subjects expressly delegated to the rulemaking authority of the Department of Transportation.[51] Rulemaking necessarily involves the determination of 'legislative facts' as distinguished from 'adjudicative facts.'[52] Though a court, with its adversary procedure, is not necessarily precluded from resolving issues of legislative fact, Borden's Farm Products, Inc. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281, it is generally thought that their determination is particularly appropriate to the administrative process, where staffs of specialists and great storehouses of information are available.[53] Also, while the dictates of due process require that a party has a right to be heard when official action is based upon 'individual grounds,' such is not necessarily the case when official action is based upon 'general grounds,' that is, when the facts are adjudicative but not when they are legislative. Likewise, the need for confrontation is diminished or nonexistent. Thus, as a matter of principle the trial method is not required for development of general facts that are used for making law or policy or for guiding the exercise of rulemaking discretion. As such, the administrative agency, unlike the court, is not constrained by iron-clad evidentiary rules to stay within the record.[54]
 
 
 78
 Exploiting fully DOT's primary jurisdiction will assure also that the Court--struggling for the correct decision on this ominous problem--will have the benefit of the official view of the agency most directly concerned with highway motor carrier driver safety. In deciding such a serious problem the trier ought not to be left, as was the Judge below, in the predicament of trying to choose the view, pro and con, of the incumbent Deputy Director of the Bureau of Motor Carrier Safety who, as a witness, supported the government's position but who was opposed by equally explicit contrary testimony from his immediate predecessor[55] who likewise appeared as an expert witness but on behalf of the carriers.
 
 DOT Has Not Yet Spoken
 
 79
 The Court, by a detailed letter directive citing the appropriate DOT regulations and most of the Court precedents discussed by me on primary jurisdiction, requested supplemental briefs. The matter propounded was
 
 
 80
 '* * * whether, in view of the statutory responsibility of the Department of Transportation (DOT) (see, e.g., DOT Regulations on Driver Safety (not including age limitation) 49 C.F.R. 391, 49 C.F.R. 39.43, 49 C.F.R. 391.31, 49 C.F.R. 391.15, 49 C.F.R. 392.5, 49 C.F.R. 392.4, 49 C.F.R. 391.51, it is appropriate to invoke the doctrine of Primary Jurisdiction to require the parties to submit to the Department of Transportation (DOT) the question of the use by interstate bus operators of maximum age restrictions for driver applicants.'
 
 
 81
 Tamiami's response in opposing reference to DOT was a natural mixture of a bird-in-the-hand from a victory below and the buckler and shield of F.R.Civ.P. 52(a). The Government opposed on the ground that (i) under guiding standards the case is not appropriate for primary jurisdiction, and (ii) either separately or as a part of (i) DOT had already spoken in an authoritative voice that was both loud and clear. As proof of (ii) it attached May 1974 correspondence to and form the Department of Labor Solicitor's office and the Director, Bureau of Motor Carrier Safety, DOT and an earlier 1970 exchange involving the Greyhound case which was readopted for 1974.
 
 
 82
 Grediting these fully as a legitimate part of the Government's response to our inquiry I do not at all think they establish either an authoritative factual-legal answer or even meet my insistence that DOT, not just a bureau head, should study, hear and decide the ominous issue.
 
 
 83
 Specifically the 1970 DOT response was to a question no way tied up with primary jurisdiction.
 
 
 84
 'Specifically, you ask for our position on Greyhound's argument that age is a bona fide occupational qualification for its bus drivers, within the meaning of section 4(f)(1) of the Act, 29 U.S.C. 623(f)(1), and that exclusive jurisdiction to determine whether its maximum age limitation is lawful is vested in the Interstate Commerce Commission and the Federal Highway Administration.'
 
 
 85
 (Emphasis added).
 
 
 86
 Next, the idea that fixing age is beyond the jurisdiction or responsibility of DOT is refuted by its earlier action of fixing 21 years as the minimum. DOT simply ducked the problem by replying:
 
 
 87
 'With respect to the issue of age of drivers, both the new and the old versions of Part 391 are identical; they require each driver to be at least 21 years of age, but they do not include a maximum age limitation. Therefore, under the existing safety regulations, there is no restriction against the hiring of any person who has attained his majority as the driver of a commercial vehicle.'
 
 
 88
 More than that it pleaded ignorance.
 
 
 89
 '* * * we assume that Greyhound could vindicate its policy by showing that a driver who is over 35 years of age creates a greater safety risk than one who is younger. We have made no study of the matter, and are, therefore, unable to take a position on it.'
 
 
 90
 And finally it recognized that if DOT after rulemaking hearings fixed a maximum employment age it would be 'preclusive'.
 
 
 91
 'In other words, we do not believe that our silence on the subject of hiring older persons as drivers should be construed to have a preclusive effect on the operation of the Age Discrimination in Employment Act. If, in the future, the Motor Carrier Safety Regulations are amended to add a maximum age limitation, we believe that that limitation should be deemed a bona fide occupational qualification under section 4(f)(1) of the Act.'
 
 
 92
 All of this was reiterated in the May 1974 response.
 
 
 93
 'The rules have not been amended in this respect (maximum age) since that date, and no maximum age requirement now exists. Our position as set forth in the September 8, 1970, letter remains unchanged.'
 
 
 94
 And then, disclaiming knowledge of any evidence showing that 'persons excluded--under maximum age criterion would be less safe--' it puts the burden not on DOT as the responsible statutory agency to promulgate regulations as the statute charges it with, but upon private parties.
 
 
 95
 'Furthermore, our rule making procedures, 49 CFR 389.31, permit 'any interested person' to petition the Bureau for an amendment to the driver qualification regulations and to support the petition with evidence tending to show that the amendment would result in a safer driver force. Neither Greyhound nor Tamiami Trails, nor any other party, has filed a petition for rule making, asking the Bureau to establish a maximum age for drivers.'
 
 
 96
 Such an unacceptable result is precisely why the doctrine of primary jurisdiction came into being and has thrived so heartily. The initiative is not left to the agency. The Court pulls the trigger just as we did in all of our cases. See Huber, Weymouth, Carter, Southwest Molasses and others.
 
 DOT Reference Not The End
 
 97
 As the cases on primary jurisdiction make so clear, the Court does not abdicate. It must still decide. After conclusion of the primary reference to DOT, the ultimate decision or ruling will, of course, have to be made by the Court--a traditional judicial function. We need not determine at this time whether the reviewing Court will be the District Court below under 28 U.S.C.A. § 1336 as amended August 30, 1964,[56] or whether it will have to be reviewed by a three-judge court under 28 U.S.C.A. § 2284. After proper review the Courts must still construe § 4(f)(1) to determine its applicability to the facts as determined. Such a determination may, depending on what the facts ultimately show, require that the Court perform another traditionally judicial function--that of balancing the interest of, in the words of President Johnson, 'the not yet old and not yet voluntarily retired Americans' against the factual result regarding the dictates of safety. But when that balancing is done it can be done with the confident assurance that the agency most directly concerned with day-to-day safety in operations on the public highways by certificated motor carriers will have made, after a canvass of the whole industrial operation, an administrative conclusion yea or nea or somewhere in-between.
 
 
 98
 With the carnage on the public highways--with or without a reduced but perhaps ineffectual speed limit--the decision on this important score should not be left to the single judgment of even the most competent of trial judges and the limited review by appellate judges. We need the best we can get. And certainly we need the expert input of the agency charged directly with responsibility by Congress.
 
 
 99
 DOT can supply the initial answer on which the Courts after full reconsideration can then render a sounder judgment.
 
 
 
 [1]
 Section 4 of the Act makes it unlawful for an employer--
 (a)(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
 (a)(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;
 (e) * * * to print or publish, or cause to be printed or published, any notice or advertisement relating to employment by sucn an employer * * *, indicating any preference, limitation, specification, or discrimination, based on age.
 
 
 [2]
 Section 12 of the Act limits the prohibitions to individuals who are at least 40 years of age but less than 65 years of age. Defendant readily admitted that its practice was to consider and process for employment as intercity bus drivers only individuals between the ages of 25 and 40 (35 prior to January 1, 1970), regardless of the applicant's prior experience or physical condition, and that these age limits were specified in advertisements soliciting applicants placed by it in newspapers
 
 
 [3]
 The two complaining witnesses for which defendant admitted age as the sole reason for non-hiring were Glenn Poole, age 43 and Harry Joseph Wons, age 57
 
 
 [4]
 The remaining six complaining witnesses were William E. Land, age 53, Lewis H. Weed, age 41, James A. Rayborn, age 43, William L. Schuessler, age 44, James N. Owens, Jr., age 45, and Charles E. Roselle, age 42
 
 
 [5]
 Section 4(f)(1) provides an exception to the prohibitions against age discrimination which reads in pertinent part:
 (f) It shall not be unlawful for an employer * * *--
 (1) to take any action otherwise prohibited under subsection(s) (a) * * * of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age;
 
 
 [6]
 By order dated March 14, the trial court granted the parties' joint motion for separate trial and thereby severed the issues of liability and damages
 
 
 [7]
 See Diaz v. Pan American World Airways, Inc., supra, and note 29, infra
 
 
 [8]
 This test evolved from footnote 5 of our opinion in Weeks v. Southern Bell Telephone and Telegraph Co., 5 Cir., 1969, 408 F.2d 228, involving sex discrimination under the 1964 Civil Rights Act, as an alternative to the main Weeks test. We commented:
 It may be that where an employer sustains its burden in demonstrating that it is impossible or highly impractical to deal with women on an individualized basis, it may apply a reasonable general rule.
 408 F.2d at 235 n. 5.
 The main method of demonstrating a BFOQ discussed in Weeks was stated as follows:
 We conclude that the principle of nondiscrimination requires that we hold that in order to rely on the bona fide occupational qualifiction exception an employer has the burden or proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.
 408 F.2d at 235.
 
 
 [9]
 See note 3, supra
 
 
 [10]
 During the course of the trial the Government had abandoned its claims regarding complaining witnesses Land, Weed and Schuessler thus leaving only the claims respecting complaining witnesses Roselle, Owens and Rayborn in issue (see note 4, supra)
 
 
 [11]
 The Congressional findings underlying this purpose are stated in Section 2(a) of the Act:
 The Congress hereby finds and declares that--
 (1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;
 (2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;
 (3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;
 (4) the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.
 Congressional finding (1) above, with respect to those older Americans displaced from their jobs, was poignantly pointed out by the Director of the Office of Aging of the Department of Health, Education and Welfare when he testified before the Subcommittee on Employment and Retirement Incomes of the Special Committee on Aging, United States Senate:
 . . . It is one of the anomalies, that every time we go in an employer and we say to him, 'Tell us who are your most valuable employees,' he will almost invariably name his older employees, the people who have been with the company for many years. But if for some reason or another, because of automation or because of change in techniques, those people are thrown out of work, the older person finds the greater difficulty in being employed. (88 Cong., Part I, Dec. 19, 1963, p. 21).
 
 
 [12]
 See note 1, supra
 
 
 [13]
 Section 7(b) of the Act provides for enforcement of the Act's provision 'in accordance with the powers, remedies, and procedures' provided in §§ 16 (except for the criminal provisions) and 17 of the Fair Labor Standards Act, 29 U.S.C.A. Section 7(b) of the Age Discrimination in Employment Act further provides that any act prohibited by § 4 of the Act shall be deemed to be a prohibited act under § 15 of the Fair Labor Standards Act, and that amounts owing to a person as a result of a violation of the Age Discrimination in Employment Act shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of § 16 and 17 of the Fair Labor Standards Act
 
 
 [14]
 See note 5, supra
 
 
 [15]
 As the seniority system operates even within the extra board, the driver may not even have the privilege of selecting a particular extra board since any other driver with more seniority can select that particular run. Thus, extra board drivers with relatively low seniority are inevitably relegated to the most difficult extra board runs and locations
 
 
 [16]
 The testimony established that a long trip would be one that will take over 24 hours. Of course, DOT regulations do not permit a driver to drive more than 10 hours following 8 consecutive hours of duty. The regulations forbid a driver from remaining on duty more than 70 hours in any eight consecutive day period
 
 
 [17]
 With the passage of the Department of Transportation Act, responsibility for safety regulation was transferred from the Interstate Commerce Commission to the Department of Transportation, 49 U.S.C. 1655. Section 204(a)(1), of the Interstate Commerce Act, 49 U.S.C. 304(a)(1), provides that:
 (a) It shall be the duty of the Commission--(1) To regulate common carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.
 
 
 [18]
 Section 204 of the Interstate Commerce Act, 49 U.S.C.A. 304, authorized the Interstate Commerce Commission to establish rules governing the qualifications of drivers employed by common and contract carriers of passengers in interstate or foreign commerce. In Section 6 of the Department of Transportation Act, 49 U.S.C.A. 1655, the authority of the ICC in this respect was transferred to the Secretary of Transportation. The Secretary, in turn, has delegated this authority to the Federal Highway Administrator (49 C.F.R. 1.48), and the Administrator has redelegated it to the Director, Bureau of Motor Carrier Safety (35 F.R. 5958)
 
 
 [19]
 Recognizing the importance of the driver in the overall safety program, the Interstate Commerce Commission stated at the very beginning of operation of motor carrier safety regulations that--
 . . . First and foremost in the problem of motor-vehicle safety is the driver, the man at the wheel, (Motor Carriers Safety Regulations, 1 M.C.C. 1, 7 (1936).
 
 
 [20]
 Results of such activities relating to safety, education and inspection were reported as follows:
 Safety Education. In any regulatory program, a key desired objective is willing participation and voluntary compliance on the part of those who are regulated. Accordingly, the Bureau of Motor Carrier Safety BMCS engages in activities designed to inform concerned parties of the intent and benefits of the safe practices required by regulation. During the year such activities as the following are regularly undertaken to acquaint all concerned with new developments:
 Each known interstate motor carrier is served with a copy of the regulations. 'Service' of the Motor Carrier Safety Regulations is a fundamental step in obtaining voluntary compliance by the carriers. In FY 1971 over 7,400 carriers were provided with this 'service.'
 Approximately 700 driver clinics were conducted throughout the country, attended by over 45,000 drivers and other carrier personnel, at which the new driver qualifications regulation was explained.
 Inspection. Several activities are conducted continuously throughout the year to determine how well the safety regulations are being carried out. Information obtained from these activities is used to assist in evaluating the effect of the motor carrier safety program and, when unsafe equipment or operating conditions are found, to take remedial action. During the year the Bureau conducted the following activities:
 Safety Surveys Of Carriers 4,556
Roadside Inspections 48,851
Vehicles Placed Out of Service 10,221
Drivers Placed Out of Service 473
 
 
 [21]
 This is the stage at which the industry-wide practice operates to exclude those applicants above a certain age, in Tamiami's case--those individuals above the age of 40
 
 
 [22]
 Extracted from 49 C.F.R. 39.43, identified in the record as Plf.Ex. No. 28
 
 
 [23]
 Hodgson v. Greyhound Lines, Inc., N.D.Ill., 1973, 354 F.Supp. 230
 
 
 [24]
 Diaz v. Pan American World Airways, Inc., 5 Cir., 1971, 442 F.2d 385. The Seventh Circuit in Greyhound discussed our business necessity test as follows:
 In analyzing the standard of proof required of Pan American to establish a 'bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise,' the Fifth Circuit construed the word 'necessary' in the Act to require:
 (T)hat we apply a business necessity test, not a business convenience test. That is to say, discrimination based on sex is valid only when the essence of the business operation would be undermined by not hiring members of one sex exclusively. (Emphasis in original.) 442 F.2d at 388.
 The court proceeded to characterize the essence of the normal operation of an airline stating that: 'The primary function of an airline is to transport passengers safely from one point to another.' 442 F.2d at 388. In the court's view Pan American could not establish that the employment of male cabin attendants would have any impact on its ability to provide safe transportation and accordingly the court rejected Pan American's defense of bona fide occupational qualification. Pan American's basis for excluding male applicants, that they could not cater to the psychological needs of the passengers as adequately as females, was found to be merely 'tangential to the essence of the business involved.' 442 F.2d at 388.
 Hodgson v. Greyhound Lines, Inc., supra, at 862.
 
 
 [26]
 An example is Diaz v. Pan American World Airways, Inc., 5 Cir., 1971, 442 F.2d 385, cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267, where the would-be male cabin attendants allegedly would not have been able to comfort the passengers precisely because they were male. In Diaz, however, the second requisite of the BFOQ test (discussed below) was not satisfied
 Because Weeks is typical of most cases in which added expense would be incurred by individualized dispositions of employment applications, it should be clear that alleging this expense is insufficient to meet the employer's burden under footnote 5. Indeed, that note concluded as follows: 'No (footnote 5) showing was made here; it seems plain that it could not be.'
 
 
 [27]
 The Seventh Circuit's reliance on Diaz and simultaneous rejection of Weeks indicates a misapprehension of the rule established by those two cases. Diaz was decided in the context of the application of Weeks to Pan Am's sex discrimination in the selection of flight attendants. Before we would allow Pan Am to justify its discrimination as a BFOQ under Weeks, we held that the duties of the position for which Pan Am found it necessary to discriminate in its hiring must be reasonably necessary to the normal operation--the essence--of Pan Am's business, which we defined as the safe transportation of air passengers. Since the nonmechanical duties of a flight attendant, for which Pan Am felt most males were unqualified, were not reasonably necessary to the safe transportation of passengers, Pan Am was precluded from justifying its sex discrimination as a BFOQ under Weeks. Thus, the Diaz requirement of a correlation between the job description and the essence of the business operation is a condition precedent to the application of Weeks' BFOQ exception to the ban on hiring discrimination. As such, Diaz affirms and elaborates on the Weeks rationale. Diaz was not an exception to Weeks based on the third-party safety factor. It represented an evolution of Weeks to cover attempts by employers to discriminate on the basis of job descriptions not related to the essence of the employer's business
 
 
 [28]
 See 29 C.F.R. § 1604.2(a)(ii) (1975). We question the Seventh Circuit's reliance on Spurlock v. United Airlines, Inc., 10 Cir. 1972, 475 F.2d 216, when rejecting the Weeks standard. 499 F.2d at 862--63. In Spurlock, the employer's requirement that pilot applicants have a college degree and minimum 500 flight hours was upheld against a Title VII racial discrimination charge. In holding in favor of the employer's assertion of the job-relatedness defense of Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, the court stated that, 'when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related'. 475 F.2d at 219. Because the BFOQ defense was not considered in that case, the Weeks-Diaz standard was inapplicable. Thus, rather than lessening the BFOQ burden of the employer, the court lowered the Griggs job-relatedness burden. This distinction is crucial because, although the indefinite nature of the common law job-relatedness test may necessitate the imposition of a lighter burden when the safety of third parties is implicated, the Weeks-Diaz standard is more precise, applies to a narrow statutory defense, and does not compel the hiring of unqualified job applicants. See also Note, 16 B.C.Ind. & Comm.L.Rev. 688, 697--98 (1975)
 
 
 [29]
 This was the problem in Diaz with the non-mechanical qualifications imposed by Pan Am for its flight attendants. As we stated:
 While a pleasant environment, enhanced by the obvious cosmetic effect that female stewardesses provide as well as, according to the finding of the trial court, their apparent ability to perform the non-mechanical functions of the job in a more effective manner than most men, may all be important, they are tangential to the essence of the business involved. No one has suggested that having male stewards will so seriously affect the operation of an airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another.
 Id. at 388.
 
 
 [30]
 We believe that courts must afford employers substantial--though not absolute--discretion in selecting specific safety standards and in judging their reasonableness
 
 
 [31]
 Age in itself, Dr. Brandaleone stated, had never statistically been isolated as a factor because of its close association with the aging process
 
 
 [32]
 The Government's suggestion that the 'best evidence' here would have been a comparison between Tamiami's extra board post-40 drivers and its pre-40 extra board drivers does not compel a different answer because, insofar as the evidence shows, there are only two senior Tamiami drivers who chose to remain on the extra board apparently for the reason that they did not want to change locale
 
 
 [33]
 For historical precedent for this appellate opinion procedure see, United States v. Register, 5 Cir., 1974, 496 F.2d 1072, 1076 n. 1; see also, Wallace v. House, 5 Cir. 1975, 515 F.2d 619, 637; EEOC v. International Longshoremen's Association, 5 Cir. 1975, 511 F.2d 273
 
 
 [34]
 29 U.S.C.A. § 621
 
 
 [35]
 42 U.S.C.A. § 2000e
 
 
 [36]
 29 U.S.C.A. § 206
 
 
 [37]
 29 U.S.C.A. § 201
 
 
 [38]
 29 U.S.C.A. § 141
 
 
 [39]
 Boeing Co. v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc)
 
 
 [40]
 This Court's concern for safety, and undoubtedly that of Congress (see note 51, infra), extends far beyond that of insuring the safety of the millions of intercity bus travelers annually. It extends to an awareness of the devastating consequences of a major bus accident in terms of hazard to others rightfully using the public highways, but whose vigilance and precautionary activity is necessarily limited to their own conduct, not that of others
 
 
 [41]
 29 U.S.C.A. § 621. See also notes 29 to 30, supra and related text
 
 
 [42]
 The enormous potential effects of the decision in such a case as this is demonstrated by the ICC statistics compiled for passenger motor carriers. The states of the Fifth Circuit overlap into two of the regional areas for which the ICC compiles statistics: The South West region (Texas, Louisiana, Arkansas, Oklahoma) and the Southern region (Virginia, Kentucky, Tennessee, North Carolina, Mississippi, Alabama, Georgia, South Carolina, and Florida)
 Class I Passenger Motor Carriers
 ($1,000,000 or more annual operating revenues)
 S.W.-13 So.-13
 Carriers Carriers
 --------------- --------------
Revenue-Passenger
 Miles Over Regular
 Intercity Routes 1,308,611,726 1,062,049,579
Average Number
 Drivers 1,639 1,482
Paid Drivers Hours 3,068,614 2,751,202
Source: Transport Statistics in the United States
 Part VII for Motor Carriers
 Second Release by Interstate Commerce
 Commission
 Tables 26 and 36
 
 
 [43]
 Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911, 1955 A.M.C. 899
 
 
 [44]
 The Court again emphasized that the fact that the issue under scrutiny was one of law, not fact, or a mixture of law and fact, did not argue against primary jurisdiction:
 We may assume that the question whether a clause of this kind offends against public policy is one appropriate ultimately for judicial rather than administrative resolution. But that does not mean that the courts must therefore deny themselves the enlightenment which may be had from a consideration of the relevant economic and other facts which the administrative agency charged with regulation of the transaction here involved is peculiarly well equipped to marshal and initially to evaluate.
 360 U.S. at 420, 79 S.Ct. at 1216, 3 L.Ed.2d at 1342.
 
 
 [45]
 Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104
 
 
 [46]
 Interestingly enough, after our decisions requiring primary jurisdiction reference to the FPC, the FPC held extensive hearings and arrived at a decision (42 FPC 164) holding that gas royalties were subject to FPC jurisdiction. Showing that the case does not end, either necessarily or at all in the administrative agency, is the fact that on review to the District of Columbia Circuit, that Court reversed the decision of the FPC to declare that payment of gas royalties was not subject to the Act. Mobil Oil Coro. v,. FPC, 1971, 149 U.S.App.D.C. 310, 463 F.2d 256, cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676
 
 
 [47]
 At the outset we recognize that this is a new application of the doctrine of primary jurisdiction. But considering the broad aim of this device and the consequent flexibility of it[20] there is really nothing startling about submitting to an agency for initial decision the question of its own jurisdiction. That this ultimately is a question of law, probably one of statutory construction, is not fatal. This Court with the express approval of the Supreme Court has ordered primary jurisdiction reference of a pure question of law--the legal validity of exculpatory tariffs.[21] More recently, we have ordered reference of farreaching legal questions of the Transportation Act and the Agricultural Marketing Act and the interplay of each,[22] just as we have done in having an initial administrative determination of the validity of a tariff as justification for action claimed to violate the antitrust laws.[23]
 That that question of law happens to be one of jurisdiction does not force a different result. To the contrary, justification for judicial deferral of the jurisdictional question for initial resolution by an agency is even stronger than for a non-jurisdictional question. This is demonstrated by the many cases upholding the jurisdiction of administrative agencies to determine the coverage of their respective statutes and barring all attempts through judicial proceedings to avoid such determination.[24]
 367 F.2d at 111--12 (footnotes omitted).
 
 
 [48]
 We held:
 On this score, we think the case as it now comes to us calls for the exercise of primary jurisdiction by the ICC as a condition precedent to any future relief. That this leaves to the ICC initial responsibility for making fact findings and perhaps the even more decisive task of fashioning a policy which it articulates in terms of a legal standard, is no longer an argument against the power to invoke decision by the administrative agency. Southwestern Sugar and Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 AMC 1631; Far Eastern Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; United States v. Western Pacific R., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; United States v. Chesapeake and Ohio Ry., 1956, 352 U.S. 77, 77 S.Ct. 172, 1 L.Ed.2d 140. And see our recent decision, Louisville & Nashville R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887, which points out that in several of these cases the reference to the ICC was of a question of transportation law, not just the interpretation of obscure tariffs.
 349 F.2d at 833--84.
 
 
 [49]
 We stated:
 this Court has given full voice to this device. And in nearly every instance where we order it, it ought first to have been ordered by the trial Court. Thus, contrary to the suggestion of appellants that as Judges we are in as good a position to read Tariff No. 132 as the FCC, we sent a tariff construction problem to the ICC in Louisville & N.R.R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887. There it was tariffese which created the problem. Here it is largely technological consideration as to the equipment, apparatus, etc., reasonably within the tariff's description. In River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, aff'd, 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, we ordered reference to the ICC of a serious problem of law under published tariffs. And in Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873, we sent to the ICC for initial determination the serious and far-reaching question of law concerning the interpretation and application of the Transportation Act and the interplay of the Agricultural Marketing Act, 12 U.S.C.A. § 1141 et seq.
 365 F.2d at 498.
 Illustrating that the parties most strongly opposing primary jurisdiction reference may be quite pleased with the outcome is the fact that on reference to the FCC it held the foreign equipment tariff invalid.
 
 
 [50]
 This record illustrates the relative inadequacy of the traditional adversary Court record procedure against the greater latitude of an administrative hearing. Along with the deposition of its expert witness, the government sought to introduce 28 various and assorted publications by eminent authorities on the effects of aging upon functional abilities. Although many of these articles contain the results of many scientific studies and analyses which were relevant and had a direct bearing on the questions under consideration, the trial judge felt compelled under prevailing evidentiary rules to sustain such objections as to the admission of 18 of the documents
 
 
 [51]
 The Interstate Commerce Act empowered the Interstate Commerce Commission (authority now vested in the Department of Transportation, see note 17, supra)--
 To administer, execute, and enforce all provisions of this chapter (Part II of the Interstate Commerce Act relating to Motor Carriers), to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration;
 The Act further provides that--
 For the purpose of carrying out the provisions pertaining to safety, the Commission may avail itself of the assistance of any of the several research agencies of the Federal Government having special knowledge of any such matter, to conduct such scientific and technical researches, investigations, and tests as may be necessary to promote the safety of operation and equipment of motor vehicles as provided in this chapter; the Commission may transfer to such agency or agencies such funds as may be necessary and available to make this provision effective.
 
 
 [52]
 The distinction between adjudicative facts and legislative facts was first advanced in a 1942 article by Professor Davis, Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv.L.Rev. 364, 402--16 (1942). In discussing this distinction in his Administrative Law Hornbook, Professor Davis writes:
 '(A)djudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.'
 He continues--
 Facts pertaining to the parties and their businesses and activities, that is, adjudicative facts, are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavorable to them, that is, without providing the parties an opportunity for trial. The reason is that the parties know more about the facts concerning themselves and their activities than anyone else is likely to know, and the parties are therefore in an especially good position to rebut or explain evidence that bears upon adjudicative facts. Yet people who are not necessarily parties, frequently the agencies and their staffs, may often be the masters of legislative facts. Because the parties may often have little or nothing to contribute to the development of legislative facts, the method of trial often is not required for the determination of disputed issues about legislative facts. Davis, Administrative Law, 3rd Ed., 1972, p. 160.
 It is interesting to note in this context the development of the new Federal Rules of Evidence as enacted by Congress, Pub.L. 93--595, § 1, 88 Stat. 1926, fully effective July 1975 in the section dealing with Judicial Notice states that--
 'A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'
 Rule 201(b).
 This rule as framed 'governs only judicial notice of adjudicative facts,' Rule 201(a). It reflects the historical attitude that 'a high degree of indisputability is the essential prerequisite' for judicial notice of an adjudicative fact (see Advisory Committee's Note to Rule 201(a)). Adjudicative facts are the peculiar facts relevant to the particular case in controversy and are normally adduced through the testimony of witnesses. For that reason, only those adjudicative facts outside the area of reasonable controversy warrant dispensing with the adversary process. Though it is unnecessary for us to address the question here, the omission of any similar treatment with respect to legislative facts, defined as 'those (facts) which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body' (see Advisory Committee's Note to Rule 201(a); see 56 FRD 201) seems to suggest a different, perhaps a relaxed, standard to be employed for their notice.
 At one stage in reconsideration by the House (H.R. 5463) the restriction of Rule 201 to 'adjudicative facts' only was deleted from the catch line as was subparagraph (a). Of interest is the note of the Subcommittee on Criminal Justice of the House Judiciary Committee which drafted the proposed revised provision:
 'As proposed, Article II was restricted by subdivision (a) to 'adjudicative' facts, as contrasted with 'legislative' facts. The import of both terms was discussed in the Advisory Committee's note, but the Subcommittee nonetheless felt that the distinction was not clear and would breed litigation. The Subcommittee also felt that differing treatment for the two types of facts was unjustified. Accordingly, subdivision (a) was deleted.'
 However, as finally enacted § 201 survived as submitted by the Supreme Court save for subsection (g) dealing with Court instructions in criminal cases.
 
 
 [53]
 It is significant to note that the agency responsible for motor carrier safety is statutorily empowered to exhaust any and all available governmental resources for researching questions concerning safety (see note 51, supra)
 If nothing else, this reflects an expression by Congress of the thoroughness to be accorded those administrative deliberations where the safety of the public is at stake.
 
 
 [54]
 The Board was created for the purpose of using its judgment and its knowledge, Chicago, B & Q Ry. v. Babcock, 1907, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636
 Writing on the expertise presumed to be held by an administrative agency Professor Davis states:
 Clearly, in all aspects of the agency's activities, including the decision of particular cases, we want the advantages of specialization and expertness to the extent that the agency and its staff are able to supply them. We want the appraisal of the evidence to be guided by experience, not limited to literal words of witnesses. We want both understanding and knowledge to influence the exercise of judgment or discretion. To the maximum extent that the agency is able to do so within its proper budgetary restrictions, we want the agency to make its policy choices on the basis of facts, facts, and more facts. The wisdom we seek is made up of multifarious ingredients that often defy identification and usually defy separation from other ingredients--knowledge of specific facts, understanding of general facts, prior experience in trying to solve similar problems, scientific information, mental processes such as logic or reasoning, mental processes such as appraising or estimating or guessing, formulation and application of notions about policy, imagination or inventiveness, intuition, controlled emotional reactions. Davis, Administrative Law Treatise, Ch. 15, p. 341--342 (1958).
 
 
 [55]
 This Court's experience with the FPC gas royalty jurisdictional problem (see notes 43, 44 and 45, supra) illustrates why the trial judge was largely helpless. By a letter directive we first sought amicus briefs from FPC's general counsel. The Commission determined that he could not speak, even informally, without a preliminary determination by the FPC itself. This was formally filed and on the basis of it we referred it to the FPC under primary jurisdiction after which hearings were held. A request to DOT by the trial judge would likely have resulted in nothing more than was furnished--the personal views of the incumbent Deputy Director as a witness since he could not speak for the Department without its prior determination and its determination would have required some character of investigation, hearing and decision
 
 
 [56]
 See Pennsylvania Railroad Co. v. United States, 1960, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 and Agricultural Transp. Ass'n of Texas v. King, 5 Cir., 1965, 349 F.2d 873, 883, this may turn on whether DOT, as transferree of many of the ICC's responsibilities (see notes 17 and 18, supra), steps into the § 1336 shoes of the ICC